UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOWE INVESTMENTS LTD., <br><br> Plaintiff, <br><br> v. <br><br> QUARLES & BRADY LLP, et al., <br><br> Defendant. | Case No.:  14cv1436-JAH (KSC) <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN ITS ENTIRETY [DOC. NO. 31]** |

## INTRODUCTION AND BACKGROUND

This matter comes before the Court on motion for summary judgment, or, in the alternative, for partial summary judgment, filed by Defendant Quarles & Brady, LLP ("Quarles & Brady" or "Defendant"), [doc. no. 31], following this Court's order dismissing three of Plaintiff How Investments LTD.'s ("Howe" or "Plaintiff") original causes of action, [doc. no. 7]. Only Howe's fraud and negligence causes of action remain. Defendant's motion has been fully briefed by the parties. See Doc. Nos. 36, 40. After careful consideration of the record, including the pleadings and exhibits submitted by the parties, oral argument from counsel, and for the reasons set forth below, the Court **GRANTS** Quarles & Brady's motion for summary judgment, in its entirety.

//

//

1. **Factual Background**[1]

   A. **Howe's Removal from CRM Membership**

When CRM Co. LLC was formed in 1998, its four original members executed an operating agreement. See Doc. No. 36, Exh. 4. Tim Tuttle was CRM's initial CPA and attorney, and formed CRM Co. and CRM Holdings, LLC (collectively "CRM"). See Doc. No. 36-20 at 16. At formation, CRM included four members (Barry Takallou, Hamid Malakooti, Shepard B. Ansley, and Robert Jull). See Doc. No. 36, Exh. 4 at 1171. Since inception, Ansley held his original shares in an entity referred to as "The SodaMaster Corporation." Id. at 1173. On May 5, 2000, Tuttle wrote a memo to the members of CRM opining on the propriety of Jull's transferring his membership interest to Howe, a limited liability company formed in the British Virgin Islands. See Doc. No. 36, Exh. 6. Tuttle expressly limited his opinion to Jull's ability to make such a transfer, and did not address the ramifications the transfer may have on CRM in the future. Id.

In 2003, Quarles and Brady, a law firm, was retained as counsel to represent CRM, and Robert Bornhoft took over Tuttle's legal responsibilities with respect to CRM. See Complaint ¶ 5. Between 2003 and 2010, Quarles & Brady formed four additional companies under the CRM umbrella. See Complaint ¶ 7. On November 8, 2004, Robert Jull transferred his interest to Howe, a decision made on the advice of his accounting firm, KPMG Dublin, and his Canadian attorney.[2] Howe is owned by nominee banks who have agreed that Jull is the sole financial beneficiary of the company, which makes Jull the "beneficial owner" of Howe. See Doc. No. 36, Exh. 5. Howe, CRM's largest shareholder, owned a 32.31% interest in each of the CRM entities, located in California and Arizona.

---

[1] The following background facts have been taken from the parties' briefs, and this Court's prior order granting in part and denying in part Quarles & Brady's motion to dismiss. Doc. No. 7. Unless otherwise noted, the facts herein are undisputed.

[2] Robert Jull is a Canadian citizen who resides in Ireland. See Complaint ¶ 1.

See Amended Complaint ¶ 9. In November 2004, Quarles & Brady advised CRM that, in the interest of prudent business, any CRM entity, should have a US taxpayer ID number, because Quarles & Brady couldn't tell whether Howe had one. See Doc. No. 36 Exh. 26 at 303.

On December 29, 2011, at the annual CRM member meeting, the CRM member representatives discussed the need for transparency with respect to all of the ownership interests in CRM. See Doc. No. 36, Exh. 19 at 224. At that meeting, Jull agreed to promptly provide to CRM documentation evidencing his ownership of Howe Investments Limited. Id. On January 31, 2012, Howe's senior trust officer, Andrew Briddon, submitted a letter which failed to include documentation verifying Jull's ownership of Howe. See Doc. No. 36, Exh. 24 at 295-96. Accordingly, on February 3, 2012, Quarles & Brady requested ownership verification documents such as (1) the formation, organization, and existence of Howe; (2) the binding and enforceable transfer by Jull of his rights in CRM to Howe; (3) the decision-making authority of Jull in transactions at the member level on behalf of Howe; and (4) whether the sole ownership interest and title in Howe is held by Jull. Id. Howe's response to the letter was to give notice that its attorney, Patrick W. Martin, was tasked to "deal with it." See Doc. No. 31, Exh. B at 37.

Until September 2011, CRM's primary source of bank financing was M&I Bank. See Doc. No. 31, Exh. II at 8. M&I extended a $5,000,000 line of credit to CRM. Id. However, CRM's $5,000,000 line of credit expired on September 5, 2011. Id. Barry Takallou continued his efforts to obtain a new line of credit from other banks while Quarles & Brady was attempting to obtain more information from Howe. See Doc. No. 31, Exh. A at 137. When Takallou was unsuccessful in obtaining a new line of credit, as of February 20, 2012, he made a personal loan of $500,000 to CRM, then issued a $2,000,000 capital call. Id. The capital call caused a rift between Jull and other CRM members. See Doc. No. 31, Exh. D at 50. Due to the inability to obtain a line of credit while ambiguity swirled around Howe's ownership interest, in April 2012, the CRM members voted to amend their

operating agreement to further transparency among members and preclude ownership that inhibited financing. See Doc. No. 31, Exh. P.

On May 14, 2012, President and CEO of CRM, Barry Takallou, received a response from Union Bank regarding a "Credit request for CRM Co., LLC," indicating that the bank was at an impasse due to the inability to identify the ownership—particularly who or what entity held a controlling interest of Howe and its 31% ownership stake of CRM. See Doc. No. 36, Exh. 15 at 204. Additionally, on May 15, 2012, Takallou received another denial letter declining to extend a line of credit to CRM. See Doc. No. 31, Exh. J at 3. Specifically, the letter stated that M&I Bank was apprehensive because identification of Howe's ownership interest was not clear, and did not comply with the Patriot Act. Id. In June of 2012, CRM amended its operating agreement by approval from its members. See Doc. No. 31, Exh. A at 186; Exh. D at 78; Exh. E at 107. Jull initially considered changing Howe's ownership interest to comply with the amendments, but decided against it. See Doc. No. 31, Exh. B at 181. Quarles & Brady communicated to Howe, its attorney, and to Jull, that, as of June 29, 2012, (1) CRM had not yet received the requested documentation from Howe or Jull to verify that Howe met the United States Ownership and the Patriot Act compliance sections of the amended operating agreement; and, therefore, (2) Howe was disqualified as a member of CRM. See Doc. No. 36, Exh. 30 at 382.

**B.    Howe's Settlement**

After being removed as a CRM member, Howe promptly exercised its arbitration rights under the operating agreement, seeking to determine the fair market value for Jull's shares. See Doc. No. 31, Exh. B at 16-17. CRM hired two appraisers to evaluate Howe's ownership, but Jull believed the values calculated were not adequate or complete. Id. at 17. One appraiser valued Howe's interest at $3.5 million, and another experienced appraiser determined Howe's shares to be worth $3.62 million. See Doc. Nos. 31, Exh. W; Exh. T. As of November 16, 2013, Vantage Point Advisors determined the fair market value for Howe's interest, as of December 31, 2011, to be $3.63 million. See Doc. No. 36, Exh. 11 at 21. Although Jull knew he could proceed and have an arbitrator rule on the value of

4

Howe's shares, CRM and Howe reached a voluntary settlement with respect to Jull's belief, due to the condition allowing Howe to sue Quarles & Brady. See Doc. No. 31 Exh. B at 18-19, 26.

**2.     Procedural History**

On May 9, 2014, Howe filed a complaint against Quarles & Brady in the Superior Court of California, County of San Diego, asserting claims for fraud, intentional interference with contractual relationship, defamation, negligence, and unlawful discrimination. See Doc. No. 1-2.

On June 13, 2014, Quarles & Brady removed the action to this Court, asserting diversity jurisdiction. See Doc. No. 1. On June 20, 2014, Quarles & Brady filed a motion to dismiss Howe's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). See Doc. No. 3. After the motion was fully briefed by the parties, on March 25, 2015, this Court granted in part and denied in part Quarles & Brady's motion without prejudice. See Doc. No. 7. On March 29, 2016, Howe filed its first amended complaint, asserting claims for fraud and negligence. See Doc. No. 24. Quarles & Brady filed its answer to Howe's amended complaint on April 15, 2016. See Doc. No. 27.

On May 23, 2016, Quarles & Brady filed the instant motion for summary judgment. See Doc. No. 31. Howe filed its response in opposition on July 1, 2016, including objections to evidence used to support the summary judgment motion. See Doc. Nos. 36, 37. Quarles & Brady filed its reply on July 11, 2016. See Doc. No. 40. On July 18, 2016, this Court held a hearing and entertained oral argument on Quarles & Brady's motion for summary judgment. See Doc. Nos. 41, 42. Both parties appeared at the hearing, and, ultimately, the matter was taken under submission. See Doc. No. 42 at 48.

//
//
//
//
//

# DISCUSSION

## 1. Summary Judgment Standard

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23. Where the party moving for summary judgment does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating that "there is an absence of evidence to support the non-moving party's case." Id. at 325. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact, nor is it required to offer evidence negating the moving party's claim. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 885 (1990); United Steelworkers v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989). "Rather, the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied." Lujan, 497 U.S. at 885 (quoting Celotex, 477 U.S. at 323). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

If the moving party meets the initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)) (internal quotations omitted).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

The Ninth Circuit has previously acknowledged that declarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position. S.E.C. v. Phan, 500 F.3d 895, 909 (9th Cir. 2007) (holding that the district court erred in disregarding declarations as "uncorroborated and self-serving"). Although the source of the evidence may have some bearing on its credibility and on the weight it may be given by a trier of fact, the district court may not disregard a piece of

7

evidence at the summary judgment stage solely based on its self-serving nature. See id. However, a self-serving declaration that states only conclusions and uncorroborated facts would not generally be admissible evidence. See id.; see also Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1059 n. 5, 1061 (9th Cir. 2002) (holding that the district court properly disregarded the declaration that included facts beyond the declarant's personal knowledge and did not indicate how she knew the facts to be true); F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

**2.      Fraud**

To establish a fraud claim, a plaintiff must prove all of the following: (1) that defendant represented to plaintiff that a fact was true; (2) that defendant's representation was false; (3) that defendant knew that the representation was false when he/she made it, or that he made the representation recklessly and without regard for its truth; (4) that defendant intended that plaintiff rely on the representation; (5) the plaintiff reasonably relied on defendant's representation; (6) the plaintiff was harmed; and (7) plaintiff's reliance on defendant's representation was a substantial factor in causing its harm. See Judicial Council of California Civil Jury Instruction (CACI), No. 1900 (2013); see also Engalla v. Permanente Medical Group, Inc., 15 Cal.4th 951, 974 (1997); Cal. Civ. Code §§ 1572, 1709, 1710(1). A representation may be made orally, in writing, or by non-verbal conduct. See Thrifty-Tel, Inc. v. Bezeneck, 46 Cal.App.4th 1559, 1567 (1996).

There are two causation elements in a fraud cause of action: (1) the plaintiff's actual and justifiable reliance on the defendant's misrepresentation must have caused him to take a detrimental course of action; and (2) the detrimental action taken by the plaintiff must have caused his alleged damage. Beckwith v. Dahl, 205 Cal.App.4th 1039, 1062 (2012). A complete causal relationship between the fraud and the plaintiff's damages is required, and causation requires proof that the defendant's conduct was a "substantial factor" in bringing about the harm to the plaintiff. Williams v. Wraxall, 33 Cal.App.4th 120, 132 (1995).

### 3. Negligence

An attorney is negligent if she fails to use the skill and care that a reasonably careful attorney would have used in similar circumstances. See Judicial Council of California Civil Jury Instruction (CACI), No. 600 (2006). An action against an attorney for a wrongful act or omission, other than actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first. Cal.Code Civ. Proc. § 340.6(a). Under section 340.6(a) a defendant has the burden of proving that plaintiff discovered or should have discovered the facts alleged to constitute defendant's wrongdoing more than one year prior to filing the action. See Samuels v. Mix, 22 Cal.4th 1, 8-9 (1999). The statute of limitations period begins when the client discovers, or should have discovered, the facts essential to the claim, and the client suffers appreciable and actual harm from the malpractice. Id. at 11. Once the plaintiff has a suspicion of wrongdoing, and therefore an incentive to sue, he must decide whether to file a suit or sit on her rights. So long as a suspicion exists, it is clear that the plaintiff must go find the facts; she cannot wait for the facts to find her. Jolly v. Eli Lilly & Co., 44 Cal.3d 1103, 1111 (1998).

## ANALYSIS

Quarles & Brady contends that Howe's remaining legal claims for fraudulent misrepresentation and negligence fail, as a matter of law, based on the undisputed facts. See Doc. No. 31-1 at 14. Specifically, Quarles & Brady argues that the fraud claim fails because Howe did not rely upon the alleged misrepresentations made by Quarles & Brady. Id. at 14-15. Quarles & Brady also asserts that Howe's negligence claim fails because it is barred by the statute of limitations. Id. at 15. Notwithstanding its other arguments, Quarles & Brady argues that its conduct did not cause damage to Howe. Id. at 15-21. In particular, Defendant contends that none of its actions caused Howe's removal from CRM's family

9

of companies or diminished Howe's settlement, which Quarles & Brady contends is reasonable in all respects.

In opposition, Howe argues that Quarles & Brady has not met its burden of proof. See Doc. No. 36 at 18-19. Howe contends it has evidence of fraud, claiming Quarles & Brady made false statements, knew or should have known that these statements were false, intended for Howe to rely on the statements, Howe reasonably relied on the misrepresentations to its detriment, and Howe was damaged. Id. at 19-24. Howe also argues that its negligence is not time-barred by the statute of limitations because it was not aware of Quarles & Brady's alleged misrepresentations until the commencement of discovery. Id. at 24-26. Furthermore, Howe argues that sufficient evidence of damages exists on the record. Id. at 26-28.

In reply, Quarles & Brady maintains that both of Howe's remaining claims fail because the undisputed material facts show that it did not cause damage to Howe. See Doc. No. 40 at 2-5. Specifically, Quarles & Brady asserts that Howe offers no evidence to show it would not have been removed from CRM had Quarles & Brady acted differently. Id. Quarles & Brady also maintains that Howe cannot show that it received less than the full appraisal value of its shares, when it sold its interest in CRM. Id. at 5. Moreover, Quarles & Brady argues that Howe's fraud claim fails because the undisputed material facts show that Howe cannot establish reliance on a false statement. Id. at 6-10. Last, Quarles & Brady argues that statute of limitation principles absolutely bar Howe's negligence claim as untimely. Id. at 11.

**1.    Fraud**

**A.  False Statement**

It is undisputed that Howe's claim is grounded on Quarles & Brady February 3, 2012 letter which represented that CRM's efforts to obtain new bank financing was impeded by Howe's foreign domicile, and that the best solutions were to either restructure Howe's ownership, or to immediately establish domicile in the United States. See Doc. No. 31-1 at 14-15; Doc. No. 31, Exh. N.; Doc. No. 36 at 19. With respect to the February 3, 2012 letter,

the Court finds that Howe cannot show that Quarles & Brady's statements in the letter were false. To the contrary, evidence on the record clearly supports the veracity of Quarles & Brady's statements. For example, on June 10, 2011 (months before Quarles & Brady drafted the letter at issue), at CRM's Member Annual Board Meeting, CRM's President told other members, including Jull, that the company continued to encounter significant business risk, including severely limited bank financing options and hampered government contract opportunities, due to the lack of transparency in CRM's ownership structure. See Doc. No. 31, Exh. G at 6. Indeed, Jull maintained that he owned 100% of Howe and agreed to provide the requested legal documents to CRM's attorney "ASAP," however, as of February 3, 2012, CRM was not provided all of the documentation. See Doc. Nos. 31, Exh. K; 36, Exh. 28 at 370.

Moreover, Quarles & Brady's expert, Brain H. Kelley,[4] opined that Howe's corporate structure raised numerous red flags under the Patriot Act, the Bank Secrecy Act ("BSA"), the Annunzio-Wylie Anti-Money Laundering Act ("AML"), and banks' internal compliance policies. See Doc. No. 31 Exh. II at 11, 14. Specifically, Kelley opined that it is hard to imagine an offshore jurisdiction more alarming to U.S. banks in 2012 seeking to tighten BSA/AML guidelines under the Patriot Act than the British Virgin Islands ("BVI")—Howe's place of organization—as the BVI is a notorious tax haven for its banks secrecy laws and lack of transparency.[5] Id. at 14.

---

[4] The Court finds Brian H. Kelley has the requisite experience and training to render expert opinion on whether Howe impeded CRM's ability to obtain financing with banks due to justifiable concerns under Customer Identification Programs and whether such concerns were adequately addressed by information provided to CRM by Howe.

[5] Howe argues that Kelley did not review the Corporate Administration Agreement and the bare trust agreements. However, Kelley's report indicates that he reviewed documents Bates stamped "Q&B001038 through Q&B001086" which included those documents. Accordingly, the Court does not need to address Howe's challenge.

Howe argues that the statements made in the February 3, 2012 letter were false because Quarles & Brady knew that Howe had not yet provided Howe's corporate documents when it sent the February 2012 letter. See Doc. No. 36 at 21. Howe additionally argues that Quarles & Brady could not have known that any bank needed proof of Howe's ownership in February 2012 because no bank denied CRM a line of credit until May of 2012. See Doc. No. 36, Exhs. 41, 51. However, the record reflects that Howe was aware of Quarles & Brady's desire for Howe's ownership interest details—for the purpose of transparency and to clarify any ambiguities—since November of 2004. See Doc. No. 36, Exh. 26 at 303. Although Howe promised to furnish its ownership documents in June of 2011, Quarles & Brady did not receive Howe's ownership materials until March 27, 2012. See Doc. Nos. 31, Exh. DD at 3-6; 36, Exh. 28 at 370-371. Due to Jull's lack of capacity to act as an officer or member of Howe, according to the documents Howe submitted, questions were raised as to whether Howe could attend CRM member meetings. See Doc. No. 31 Exh DD at 3-6. Consequently, additional documentation was requested from Howe for clarification purposes. Id.

The Court finds that Quarles & Brady's February 2012 letter was not false. Drawing all inferences from the underlying facts in favor of Howe, the Court finds that the February 2012 letter was objective legal advice regarding potential banking risks. Accordingly, the statement should not be deemed false merely because a bank had not sent a written denial to CRM until after the letter. Therefore, the Court finds Quarles & Brady's statements about the need for amending CRM's ownership structure due to Howe's ambiguous ownership identity were not false.

**B. Reliance**

Howe contends that it relied on various representations by Quarles & Brady: (a) it was solely representing the CRM companies and their best interests and not the interests of any owners in preference to another; (b) it recommended amending the operating agreements to establish a holding structure for the benefit of the companies and all the owners; (c) a company with a foreign owner would not be able to obtain bank funding; (d)

12

a company with a foreign member would not be able to obtain government projects; (e) it was knowledgeable about the law related to corporate ownerships held in foreign companies; and (f) Howe was in violation of the CRM operating agreements. See Doc. No. 36, Exh. 52 at 8. Howe's counsel turned over its ownership verification matters in reliance on the statements by Quarles & Brady. See Doc. No. 36 at 22. Howe asserts it reasonably relied on Quarles & Brady's representations that banks would not finance CRM due to Howe's ownership structure and did not initially challenge CRM's ability to divest Howe's ownership. Instead, it sought compensation for its shares through arbitration with CRM. See Doc. No. 36 at 23-24. To the extent Quarles & Brady argues Howe's reliance was not reasonable or justified, according to Howe, the reasonableness of the reliance is ordinarily a question of fact for the jury. Guido v. Koopman, 1 Cal.App.4th 837, 843 (1991).

Here, the Court finds that it is undisputed that Howe was harmed on June 29, 2012 by the letter terminating Howe's interest in CRM. See Doc. Nos. 31 at 12; 36 at 24. However, the evidence demonstrates that the underlying substantial factor was Howe's decision not to provide adequate documentation (1) clarifying Jull's authority to make direct or member-level decisions with respect to Howe; (2) compliance with the Patriot Act; and (3) compliance with the amended operating agreement. Howe received a letter on April 25, 2012 stating that CRM found the documentation Howe submitted (about its ownership) inadequate. See Doc. No. 31, Exh. B at 42. Howe interpreted Quarles & Brady's request as irrational. Id. On April 27, 2012, in Jull's presence, CRM members voted to instruct company counsel to amend the operating agreement to restrict the manner in which the entity holds members' interest in CRM. See Doc. No. 31, Exh. P. CRM members voted to amend CRM's operating agreement on June 17, 2012. See Doc. No. 31, Exh. B at 50. Howe understood that the amendments called for all members to comply with the Patriot Act, and specific ownership transparency requirements, within three business days. Id. at 51. Howe conferred with its attorney about forming a United States entity, but decided against it, contending that it furnished the necessary documents. Id. at 45-46. Howe understood it would be bought out of its membership interest in the event it did not

comply with the amended operating agreement. <u>Id</u>. at 52-53. Importantly, Howe understood that on June 29, 2012, its membership was being divested because a disqualifying event had occurred—namely Howe's refusal to comply with the new amendments. <u>Id</u>. Accordingly, the Court finds that Howe did not rely on Quarles & Brady's representations and its representations were not a substantial factor in Howe's harm. The Court finds that the substantial factor was, rather, Howe's decision to not comply with the amended operating agreement within the prescribed time period.

**2.     Negligence**

    **A.  Statute of Limitation**

Quarles & Brady contends that its allegedly negligent representations occurred, at the latest, in February of 2012. <u>See</u> Doc. No. 31-1 at 15. Howe argues that it did not discover that Quarles & Brady participated in the harm Howe suffered until the Fall of 2013, after discovery commenced. <u>See</u> Doc. No. 36 at 24-26. In reply, Quarles & Brady maintains that once Howe had even a suspicion of wrongdoing, the limitations period commenced under <u>Jolly</u>. <u>See</u> Doc. No. 40 at 11. Thus, the issue here is *when* the one-year statute of limitation period, under California Civil Code § 340.6, began to run.

Generally, to invoke the discovery rule, a plaintiff must conduct a reasonable investigation after becoming aware of an injury, and is charged with knowledge of information that would have been revealed by such an investigation. <u>Fox v. Ethicon Endo-Surgery, Inc.</u>, 35 Cal.4th 797, 807 (2005). A plaintiff's knowledge that it has been injured, by itself, may not trigger the statute of limitations; plaintiff must also be aware that the injury was caused by the wrongdoing of another. <u>Id</u>. at 808. A plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show: (1) the time and manner of discovery; and (2) the inability to have made earlier discovery despite reasonable diligence. <u>McKelvey v. Boeing North American, Inc.</u>, 74 Cal.App.4th 151, 160 (1999). In assessing the sufficiency of the allegations of delayed discovery, the Court places the burden on the plaintiff to "show diligence." <u>Id</u>.

Howe asserts that, once discovery commenced and upon review of files and records produced by Quarles & Brady, Howe first discovered that Quarles & Brady was working with the other CRM members to force Howe out. See Doc. No. 36 at 25. Howe contends that, without discovery, it would not have known that banks were not provided explanations of Howe's corporate structure. Id. Additionally, Howe states that, prior to late 2013, it had no way to challenge Quarles & Brady's assertions that the only way for CRM to obtain an adequate line of credit was to prohibit foreign ownership. Id. at 26. However, Howe provides no evidence tending to show its diligence with respect to an investigation after learning of its undisputed injury on June 29, 2012.

Howe admits it believed Quarles & Brady's legal advice was false when it claimed Howe violated the original operating agreement. See Doc. No. 36 at 26. From January through March, 2012, Howe, through its attorneys and Jull, challenged Quarles & Brady's characterization of Howe's disclosure of the true nature of Jull's ownership. See e.g. Doc. No. 36-9 at 32-41. On April 27, 2012, during the CRM company members' First Quarterly meeting, Jull was present when one manager discussed the "correspondence from the company's counsel, Quarles & Brady, LLP (Robert Bornhoft), recommending that Mr. Jull be allowed to attend the meeting as the presumptive representative Member of Howe Investments Limited, but that Mr. Jull not be allowed to participate in any member votes at the meeting due to a lack of formal authority documentation clearly transferring a direct voting right to Mr. Jull." See Doc. No. 36-15 at 10 (Minutes of CRM Company Members' First Quarterly Meeting, April 27, 2012). Also during the meeting, the members discussed the transparency issue relating to Howe's ownership, and asked Jull for an update. Id. at 11. Apparently unsatisfied with Jull's response, Jull was reminded that he promised, as early as June 2011, to provide documentation relating to transparency of Howe's ownership. Id. Jull was also reminded that his actions and his off-shore non-U.S. ownership structure caused CRM a great deal of hardship in doing its business and obtaining banking financing. Id. In light of these hardships, a motion was made and seconded "to instruct CRM's counsel to proceed immediately with the steps to restructure the company to

implement such changes, including suitable restrictions on the entity form in which each Member holds its ownership interest in CRM." Id. After discussion, the motion was unanimously approved by the voting members. Id. at 12. In light of the evidence, and drawing all inferences in favor of Howe, Howe had reason to know a potential claim existed because it suspected a factual basis for its elements, coupled with knowledge of any remaining elements. See Fox, 35 Cal.4th at 807. Therefore, the Court finds that Howe's claim accrued, and the statute of limitations period began running no later than June 29, 2012, the date Howe clearly had knowledge of its harm.

Moreover, even if Howe satisfies the discovery rule requirements, the evidence shows Quarles & Brady's statements were not the "but for" cause of Howe's harm. In June 2012, CRM amended its operating agreement by approval from its members. See Doc. No. 31, Exh. A at 186; Exh. D at 78; Exh. E at 107. Jull initially considered changing Howe's ownership interest to comply with the amendments but decided against it. See Doc. No. 31, Exh. B at 181. Quarles & Brady communicated to Howe, its attorney, and Jull that, as of June 29, 2012, CRM had not yet received the requested documentation from Howe or Jull to verify that it met the United States Ownership and the Patriot Act compliance sections of the amended operating agreement, and Plaintiff was disqualified as a member of CRM. See Doc. No. 36, Exh. 30 at 382. Thus, Howe's decision not to provide adequate ownership to comply with the ownership transparency section of CRM's amended operating agreement was the but for and proximate cause of its harm. Therefore, the Court finds that Quarles & Brady is entitled judgment as a matter of law on this issue.

**B.     Damages**

Quarles & Brady contends that, as a matter of law, Howe cannot establish that it suffered any damages as a result of its actions. See Doc. Nos. 31 at12-17; 40 at 2-5. The Court agrees.

Howe argues that there is no question that it settled with CRM for less than the appraised due to its option to sue Quarles & Brady. See Doc. Nos. 36 at 27; 31, Exh. B at 18-19, 26. The mere probability that a certain event would occur will not support the claim

or furnish the foundation of an action for such damages. <u>Marshak v. Ballesteros</u>, 72 Cal.App.4th 1514, 1518 (1999). Damage to be subject to a proper award must be such as follows the act complained of as a legal certainty. <u>Id</u>.

The evidence does not demonstrate that Howe suffered damages, caused by Quarles & Brady's actions, by receiving a lower settlement amount. One appraisal valued Howe's interest at $3.5 million, and another determined Howe's shares to be worth $3.62 million. <u>See</u> Doc. Nos. 31, Exh. W; Exh. T. As of November 16, 2013, Vantage Point Advisors determined the fair market value for Howe's interest, as of December 31, 2011, to be $3.63 million. <u>See</u> Doc. No. 36, Exh. 11 at 21. Although Jull knew he could proceed and have an arbitrator rule on the value of Howe's shares, CRM and Howe instead reached a voluntary settlement after reaching what Jull believed was acceptable due to the express condition allowing Howe to sue Quarles & Brady. <u>See</u> Doc. No. 31 Exh. B at 18-19, 26. Although Howe placed an internal value on the ability to sue Quarles & Brady during settlement discussions, there was no guarantee the arbitrator would have assigned the same or similar monetary value on that option. Additionally, the option to sue Quarles & Brady does not guarantee Howe would have recovered.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court finds that Defendant has met its initial burden on summary judgment and Howe fails to establish a genuine issue of material fact to be resolved by the jury as to the fraud and negligence claims. Howe's claims fail as a matter of law. Accordingly, **IT IS HEREBY ORDERED** that Defendant Quarles & Brady's motion for summary judgment [doc. no. 31] is **GRANTED** in its entirety.

DATED: March 21, 2017

_____
JOHN A. HOUSTON
United States District Judge